IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CV-294-FL

| | |
|---|---|
| BRENDA JEAN PERRY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **MEMORANDUM AND** |
| MICHAEL J. ASTRUE, | ) **RECOMMENDATION** |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings (DE's 16, 17). The time for filing any responses or replies has expired. Accordingly, this matter is ripe for adjudication. Pursuant to 28 U.S.C. § 636 (b)(1), this matter is before the undersigned for the entry of a memorandum and recommendation. For the following reasons, it is HEREBY RECOMMENDED that plaintiff's motion for judgment on the pleadings (DE-16) be DENIED, defendant's motion for judgment on the pleadings (DE-17) be GRANTED, and the final decision of the defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for disability insurance benefits and supplemental security income on April 1, 2005, alleging that she had been disabled since April 1, 2005 (Tr. 105-107, 338-340). Both applications were denied at the initial and reconsideration levels of review on June 9, 2005 and October 17, 2005, respectively. A hearing was held before an Administrative Law Judge ("ALJ") on January 31, 2008 (Tr. 10). In an opinion dated March 13, 2008, the ALJ determined that plaintiff

1

was not disabled at any time from April 1, 2005 through the date of the decision (Tr. 10-16). The Social Security Administration's Office of Hearings and Appeals denied plaintiff's request for review on May 15, 2009, thus rendering the ALJ's March 13, 2008 decision final (Tr. 3-6). Plaintiff filed the instant action on December 21, 2009 (DE-16).

**Standard of Review**

This court is authorized to review defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "[S]ubstantial evidence [is] . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this court's review is limited to determining whether defendant's finding that plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

2

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that plaintiff had not engaged in substantial gainful activity subsequent to the alleged onset date (Tr. 12). At step two, the ALJ determined that plaintiff suffered from the following severe impairments: (1) depression; and (2) disc disease of the spine (Tr. 12). In completing step three, however, the ALJ indicated that plaintiff did not have an impairment or combination of impairments that were severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 13). The ALJ then proceeded with step four of his analysis and determined that plaintiff retained the residual functional capacity ("RFC") to perform a full range of light work that is simple, routine and repetitive as defined in 20 CFR 404.1567(b); 416.967(b) (Tr. 14). A Vocational Expert ("VE") testified at the hearing that the plaintiff's past work as a dry cleaner was performed at the light exertional level (Tr. 15). Based on the VE's testimony, the ALJ concluded that plaintiff was capable of performing her past relevant work as a dry cleaner (Tr. 16). Moreover,

3

the ALJ found that this work did not require the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 16). After considering these factors, at step five of his analysis, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act (Tr. 16). In making his determination, the ALJ cited substantial evidence, a summary of which now follows.

On January 24, 2003, plaintiff sought treatment at Edgecombe-Nash Mental Health and Substance Abuse Services ("Edgecombe"). Dr. Lubica Fedor, a psychiatrist, noted that plaintiff had been previously treated at Edgecombe for generalized anxiety (Tr. 318). Plaintiff was admitted to Edgecombe on December 2, 2002, and was scheduled for outpatient individual and/or group therapy. Plaintiff's treatment included eight therapy contacts and eight doctor contacts (Tr. 305-307, 309-317). At the January 2003 visit, plaintiff complained of stress and memory lapses. Plaintiff admitted that she had stopped taking zoloft which had proved effective for her conditions. Dr. Fedor reported that plaintiff was very anxious, socially withdrawn, and appeared to have a hard time coping with everyday life. Plaintiff had no evidence of hallucinations or delusions. Plaintiff denied having any harming thoughts towards herself or others. Dr. Fedor diagnosed plaintiff with recurrent, moderate major depressive disorder. Dr. Fedor prescribed plaintiff 25 mg of zoloft at bedtime for one week, after which time plaintiff would take 50 mg. Plaintiff was advised to schedule a follow-up appointment in six weeks. During this time, plaintiff was also to see a psychotherapist. (Tr. 318). However, plaintiff was discharged from Edgecombe on July 5, 2005 for failing to attend her therapy sessions (Tr. 305, 309).

Plaintiff was seen at Nash Hospitals ("Nash") for sharp knee pain on February 28, 2004 (Tr. 294-304). An left knee series was ordered for plaintiff which showed that she had demineralized bones, but no gross site of fracture or joint effusion (Tr. 304). Plaintiff was prescribed lortab for her

pain and instructed to rest her left knee. Plaintiff could return to work without limitations in two to three days (Tr. 298).

On April 6, 2005, plaintiff began seeking treatment at Boice-Willis Clinic ("Boice") (Tr. 288). Plaintiff complained of bilateral numbness in her arms as well as neck and upper back pain. A review of plaintiff's symptoms showed tingling in her hands, a rash on her right leg, fatigue, dizziness, and blurred vision, but was otherwise negative. Plaintiff underwent a head CT scan and right carotid doppler and, on May 10, 2005, plaintiff received a neurology consultation (Tr. 286-288). Although the scan was reported as normal, a small white matter low density consistent with a remote infarct in the left frontal region was present. Dr. William Deans attributed this abnormality to plaintiff's history of cocaine abuse. Plaintiff's carotid ultrasound was normal. Plaintiff was diagnosed with hyperventilation syndrome in the setting of anxiety and depression (Tr. 287). Plaintiff completed a drug screen at the request of Dr. Deans, which returned as negative. (Tr. 289). Dr. Deans wrote plaintiff a nighttime prescription for 25 mg of nortriptyline, going to 50 mg if needed. Plaintiff was advised to take aspirin daily. Dr. Deans discussed with plaintiff her prior cocaine use and its relation to stroke (Tr. 287). A few days before plaintiff's visit at Boice, on May 6, 2005, Dr. Anthony Carraway, a medical consultant for the North Carolina Department of Health and Human Services Disability Determination Services, conducted a disability evaluation for plaintiff (Tr. 290-293). Dr. Carraway made the following assessment:

> This patient describes a history most consistent with generalized anxiety disorder along with dysthymia. In addition, she has had a qualitative change to her mood symptoms secondary to her chronic pain as she reports being much more frustrated and irritable. She does have a superimposed mood disorder due to chronic pain present. She displayed moderate impairment of short-term memory and mild impairment of immediate memory. Her attention and concentration were intact. Her ability to understand, retain and perform instructions is rather mildly moderately impaired. Her ability to perform simple repetitive tasks is limited by both her
5

chronic pain and her chronic anxiety and might be more moderately impaired. Also her tasks persistence maybe more moderately impaired. Her stress tolerance appears to be poor. Her symptoms do appear forthrightly reported (Tr. 290-291).

On June 1, 2005, plaintiff returned to Boice where Dr. Deans adjusted her nortriptyline prescription to 50 mg at bedtime (Tr. 308). State agency medical consultant, Ashley Thomas, completed an examination of plaintiff's physical RFC assessment on June 6, 2005 (Tr. 278-285). The examiner concluded that plaintiff could (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk for a total of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour day; and (5) push and/or pull unlimited, other than as shown for lift and/or carry (Tr. 279). The examiner also noted that plaintiff did not have any visual or communicative limitations (Tr. 281-282). However, the examiner found that plaintiff did have postural and manipulative limitations. Plaintiff could occasionally climb ramps/stairs, but could never climb ladders/ropes/scaffolds. Plaintiff could frequently balance, stoop, kneel, crouch and crawl (Tr. 280). Plaintiff had limited handling/gross manipulation. That is, she could engaged in this activity frequently but not continuously. She had unlimited reaching in all directions, fingering/fine manipulation, and feeling/skin receptors (Tr. 281). Because plaintiff suffered from hyperventilation syndrome and dizziness, plaintiff required environmental limitations in extreme cold and heat, wetness, humidity, noise, vibrations along with fumes, odors, dusts, gases, and areas with poor ventilation. Plaintiff needed to likewise avoid concentrated exposure to hazards, such as machinery or heights. (Tr. 282).

Also on June 6, 2005, Dr. Steven Salmony completed a psychiatric review technique for plaintiff (Tr. 255-272). Dr. Salmony opined that plaintiff (1) had mild limitations in restricting of activities of daily living; (2) had mild limitations in difficulties in maintaining social functioning;

6

(3) had moderate difficulties in maintaining concentration, persistence or pace; and (4) that there was insufficient evidence of episodes of decompensation of extended duration (Tr. 265). Dr. Salmony concluded that although plaintiff suffered from dysthymia and generalized anxiety, neither impairment satisfied the diagnostic criteria of the disability determination (Tr. 258, 260). Dr. Salmony further concluded that an RFC assessment was necessary to complete the evaluation (Tr. 255). Dr. Brian Grover affirmed these findings on October 5, 2005 (Tr. 273-274).

Plaintiff was referred to North Carolina Division of Mental Health, Developmental Disabilities and Substance Abuse Services ("NC Mental Health") on March 2, 2006 for management of her depressive symptoms (Tr. 221-222, 231-232). An assessment showed that plaintiff suffered from recurrent, moderate major depression. Plaintiff goal for therapy was to feel better and to decrease or eliminate her depressive symptoms (Tr. 221-222). At the time, plaintiff reported being employed part-time and receiving good support from her son (Tr. 221). Plaintiff was to receive outpatient therapy at least monthly, and was referred to Dr. Vijay Ghate for psychotherapy. (Tr. 222, 231).

Dr. James Hood ordered an MRI of plaintiff's lumbar spine on March 4, 2006. The following was reported:

INTERPRETATION

Small hemangiomas are noted within L5 and L2 vertebral bodies. The vertebrae have normal height and alignment throughout.

T10-L3 VERTEBRAE REGION - The disks are normal. The spinal canal, intervertebral foramen, thecal sac, nerve roots, and conus medullaris are normal.

L3-L4 INTERSPACE - The disk is desiccated. Mild broad-based posterior disk protrusion is noted. Moderate bilateral facet hypertrophy is present. This combination creates mild/moderate circumferential degenerative lumbar canal stenosis. The intervertebral foramen remain patent.

7

> L4-L5 INTERSPACE - The disk is desiccated. Mild broad-based posterior disk bulge/protrusion is noted. Mild bilateral facet hypertrophy is present. This combination creates mild circumferential degenerative lumbar canal stenosis. The intervertebral foramen remain patent.
>
> L5-S1 INTERSPACE - Small central disk herniation is present. Bilateral facet hypertrophy is present. This combination creates mild/moderate circumferential degenerative lumbar canal stenosis. The intervertebral foramen remain patent (Tr. 233).

On March 8, 2006 and March 16, 2006 plaintiff received outpatient therapy at NC Mental Health. Plaintiff's sessions consisted primarily of cognitive behavioral therapy. She also learned coping skills to help with her anxiety and depressive symptoms (Tr. 229-230).

Dr. Raymond Baule, of Atlantic Neurosurgery Consultants, evaluated plaintiff on April 11, 2006 (Tr. 320-321). Plaintiff complained that she had experienced low back pain radiating to her left lower extremities for about one month. Plaintiff reported that her symptoms were exacerbated by walking or prolonged standing on hard surfaces and ameliorated by rest (Tr. 320). Dr. Baule reported that plaintiff had a normal gait, station, stance, and stride. Plaintiff underwent an MRI scan of the lumbar spine which demonstrated the following:

> [L]umbar disk degeneration at L4-L5 and L5-S1. There is central disk bugle at L5-S1 without significant neuroforaminal encroachment. There is a disk bulge at the L4-L5, it is right paracentral and does not correlate with left lateralization of the patient's symptoms (Tr. 321).

Dr. Baule opined that plaintiff's symptoms were related to lumbar spondylosis disk degeneration, and that plaintiff's symptoms were rather acute. Dr. Baule believed that plaintiff would respond to conservative pain management and physical therapy (Tr. 321). Plaintiff returned to NC Mental Health on April 18, 2006 where it is reported that she had fair progress toward her goal of reducing anxiety (Tr. 228). During an individual therapy session, on September 6, 2006,

8

plaintiff appeared to be coping well in spite of her stressful family issues. Plaintiff was advised to schedule a follow-up appointment (Tr. 227). On September 13, 2006, plaintiff exhibited a mildly depressed mood, but she showed no acute symptoms and was advised by Dr. Ghate to continue her nortriptyline prescription (Tr. 225).

Plaintiff went to the Wilson Community Health Center on October 25, 2006 for treatment of depressive symptoms. Plaintiff was advised to continue taking her medications as prescribed (Tr. 248). On October 31, 2006, plaintiff completed a patient questionnaire for the Carolina Family Health Center. Plaintiff rated her symptoms as follows: (1) nearly every day she had little interest or pleasure in doing things, had trouble falling or staying asleep, or slept too much, had a poor appetite or would overeat, and had trouble concentrating on things, such as reading the newspaper or watching television; (2) more than half of the days she felt down, depressed, or hopeless, bad about herself, or she felt that she was failure or had let her herself or her family down, and felt tired or had little energy; (3) for several days she had thoughts that she would be better off dead or hurting herself in some way; but (4) had no days where she did not feel like moving or she spoke so slowly that other people could have noticed, or was so fidgety or restless that she moved around a lot more than usual (Tr. 249). Plaintiff also rated that it was extremely difficult to do work, take care of things at home or get along with other people, and that she had felt depressed or sad on most days in the past two years (Tr. 249).

On August 10, 2007, during an individual therapy session at NC Mental Health, plaintiff reported being

> frustrated by refusal of her son and his wife to assist [plaintiff]; [plaintiff] enjoys taking care of her granddaughter but is feeling a lot of stress as a result, client still experiences depression (Tr. 214).

9

The focus of this session was to assist plaintiff in reducing symptoms of depression and social isolation, as well as aid plaintiff in setting personal goals. Plaintiff was offered alternatives to being pressured into her granddaughter's child care, and advised on the importance of being able to make her own choices (Tr. 214).

Dr. Ghate treated plaintiff on August 21, 2007. Plaintiff appeared mildly anxious but not agitated. Although plaintiff did not appear confused, she had difficulty explaining her current situation. Dr. Ghate noted that plaintiff had been seen before, but had never followed through with her recommended treatment. He also opined that it was very difficult to assess plaintiff thoroughly. Dr. Ghate advised plaintiff to continue her nortriptyline and he added lorazepam. Dr. Ghate also advised plaintiff to continue counseling to resolve the issues she faced in her daily life (Tr. 216-217). On September 26, 2007, plaintiff attended outpatient therapy where she worked with Dr. Kenneth Sheldon, a licensed psychologist, on self-talk strategies for improving her symptoms (Tr. 213). Dr. Ghate saw plaintiff on October 23, 2007 where he continued to encourage plaintiff's participation in counseling. Plaintiff was to schedule a follow-up appointment in two months (Tr. 203, 211). Dr. Sheldon saw plaintiff for outpatient therapy on October 24, 2007. During this session, plaintiff discussed her current situation, disability claim, and interactions with her sons. Plaintiff discussed changes she wanted to make and techniques to reinforce taking care of herself (Tr. 202).

On November 21, 2007, Dr. Sheldon reported the following:

> [Plaintiff] was verbal and talked about her current situation and how she has been able to go to church at least three times since our last session which was her homework assignment. During this session she discussed a number of new issues and concerns surrounding her earlier history of hospitalization and early married years. She related how she has always felt as the one left out. She discussed how she has always had negative thoughts about herself and how difficult it is to think otherwise. [Plaintiff] indicated that she is taking her mediation as prescribed . . . She also indicated that she is having a little problem with sleeping at times as she thinks

about her situation. We discussed deep breathing and she was receptive to practice it. She is also to continue going to church or getting out of the house when needed, and think again about the positive things that she indicated (Tr. 201, 209).

A follow-up outpatient therapy report on December 18, 2007 indicated that plaintiff enjoyed watching her granddaughter, continued to go to church, liked driving, and displayed a friendly personality. She also had been able to go the store, as needed. Plaintiff reported a decrease in depressive symptoms and an increase in socialization, which included church attendance at least twice per month (Tr. 197-198, 205-206).

Plaintiff testified at the hearing that during the past two years she had gained 20 pounds. Plaintiff attributed her weight gain to eating while feeling agitated and depressed (Tr. 29). Plaintiff testified that while she likely drove about seven to ten miles per week, or to the grocery store, she did not drive in her community for fear of having panic attacks or forgetting her way home (Tr. 31). Plaintiff further testified that after the eleventh grade for about six to eight months she underwent shock treatments in a mental hospital (Tr. 33). Plaintiff stated that she had worked only 24 hours in the past three years, and insisted that working agitated her nerves. Plaintiff also stated that she had crying outbursts when she attempted to work (Tr. 37). In addition, plaintiff testified that she had back pain which was worsened by prolonged sitting, standing, lifting, or walking (Tr. 39-40). However, plaintiff also testified that using heat pads or taking aleve provided her with pain relief (Tr. 41). Plaintiff stated that she was able to care for and feed her granddaughter daily, but that she could not play with the child without having back pain (Tr. 42-43). Plaintiff also testified that she could provide on her own personal care, such as taking a bath, but had difficulty doing household chores because she got dizzy, lightheaded and had pain in her head. Plaintiff testified that she had to sit down from thirty minutes to an hour when this occurred (Tr. 44-45). Plaintiff went on to

11

testify that she had experienced memory loss (Tr. 45, 47). Lastly, plaintiff testified that she could lift about ten to fifteen pounds and that her hobbies included completing crossword puzzles (Tr. 46, 50). With regards to plaintiff's testimony, the ALJ made the following findings:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment . . . (Tr. 15).

In addition to plaintiff's testimony, the ALJ also weighed the RFC and mental assessments performed by the state agency consultants (Tr. 15-16). As to his findings, the ALJ stated the following:

> The undersigned gives considerable weight to the opinions of the [s]tate [a]gency medical consultants as it is supported by the medical evidence. The undersigned gives support to Dr. Ghate's December 2007 opinion concerning claimant's psychiatric condition. None of the claimant's physicians opined that she was disabled (Tr. 16).
>
> The undersigned has considered the claimant's subjective complaints and the objective medical evidence and concludes that the claimant is able perform light exertional work that is simple, routine, and repetitive (Tr. 16).

The VE, Julie Sawyer-Little, testified during the hearing that the plaintiff's past work as a dry cleaner, DOT 589.685-038, was performed at the light exertional level and carried a specific vocational preparation, SVP, of 2 (Tr. 15, 50-52)[1]. After considering the VE's testimony, the ALJ found that plaintiff was capable of performing her past relevant work as a dry cleaner. The ALJ opined that plaintiff's RFC was compatible with the physical and mental demands of a dry cleaner, and that plaintiff was able to perform the work as it was normally performed (Tr. 16). Accordingly, the ALJ found that plaintiff had not been under a disability at any time from April 1, 2005, the

---

[1] An SVP of 2 corresponds to unskilled work as defined in 20 CFR 404.1568; 416.968.

12

alleged onset date, through the date of the decision (Tr. 16).

**Assignments of Error**

Plaintiff cites two assignments of error to the ALJ's decision. Specifically, plaintiff argues that: (1) the ALJ's RFC determination was improper; and (2) the ALJ's credibility determination was improper. Plaintiff's assignments of error essentially contend that the ALJ improperly weighed and/or evaluated the evidence before him. Although plaintiff may disagree with the ALJ's conclusions, the role of this court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. This court must uphold the defendant's factual findings if they are supported by substantial evidence. Id. The undersigned has discussed in detail the evidence the ALJ relied upon in reaching his conclusions. The ALJ's findings of fact as to plaintiff's limitations and credibility determination are supported by substantial evidence. Accordingly, the arguments in support of these assignments of error are without merit.

**Conclusion**

For the reasons discussed above, it is HEREBY RECOMMENDED that plaintiff's motion for judgment on the pleadings (DE-16) be DENIED, defendant's motion for judgment on the pleadings (DE-17) be GRANTED, and the final decision of the defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 9th day of March, 2010.

_____
William A. Webb
U.S. Magistrate Judge